**GOLDBERGER & DUBIN, PC**
Stacey Van Malden, Esq. (Bar No.: SV8077)
Of Counsel
401 Broadway, suite 306
New York, New York 10013
Phone: 212-431-9380
Email: GND401@AOL.COM

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (Cal. Bar No. 295032)*
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (Cal. Bar No. 244902)*
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

  *To be admitted *Pro Hac Vice*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMBER SMITH, ALICE MINTZ, and CATHERINE RAHIMIAN, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>YOTO INC.,<br><br>      Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

CLASS ACTION COMPLAINT

Plaintiffs Amber Smith, Alice Mintz, and Catherine Rahimian ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Yoto Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## I.  INTRODUCTION

1.      This case concerns highly dangerous children's toys called Yoto Mini speakers that have been recalled because their batteries can overheat and catch fire, posing burn and fire hazards to consumers.  These are some of the most expensive toys that parents can purchase for their young children, costing hundreds of dollars when accounting for the various accessories that parents need to purchase to use the Products.  Over the past year, however, Defendant has twice told its customers to stop using them and to "take them away from children" because the speaker's lithium-ion battery "can overheat and catch fire, posing burn and fire hazards to consumers."

2.      Defendant will not give customers money back for these defective products, and is not even offering a partial refund.  Defendant will also not give customers replacement products, despite recently coming out with a new model of these very same Yoto Mini speakers that has purportedly fixed the defect present in older models.  And, Defendant will not itself fix the Products or have an authorized representative fix them, despite a Product Guarantee in which it promised that it would.  Instead, Defendant has now implemented two deficient recalls that allow it to *say* it is doing the right thing, when in fact the primary objective is to protect its bottom line. Consumer's only option is to disassemble these electronic devices themselves and replace the lithium-ion battery, regardless of skill or ability, and then pray that the installation was completed correctly, that it has fixed the defect, and that it will not result in horrific injury to their children. As discussed below, this is not a matter of replacing, *e.g*., a AAA battery, but rather a complex installation that reasonable consumers are not comfortable or qualified to perform.

3.      The proffered "fix" is directly in breach of Defendant's Product Guarantee.  Further, reasonable customers that no longer trust the now twice-recalled devices, or who discarded the

devices after twice being told to take them away from their children due to the defect, are provided no recourse whatsoever.

4.    Plaintiffs are filing this class action lawsuit to seek all available relief to consumers, to raise awareness that Defendant's Yoto Minis are defective, and to "encourage companies to take greater care in avoiding the production [and sale] of hazardous products in the first place." *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2019 WL 6998661 at *10 (C.D. Cal. Oct. 9, 2019) (quoting *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1115-16 (C.D. Cal. 2008)).

## II.  PARTIES

5.    Plaintiff Amber Smith ("New York Plaintiff") is a citizen of New York, residing in Scotia.  Plaintiff Smith purchased a Yoto Mini directly on Defendant's website in 2023.  Before purchasing the Product, Plaintiff Smith reviewed Defendant's advertising on its website concerning the Yoto Mini, including that the Product came with "USB-C charging" and included a "USB-C fast-charge cable," which became a basis for the bargain.  Plaintiff Smith also reviewed and relied on the Product Guarantee on Defendant's website, which became a basis of the bargain, and which she understood as a contractual term that governed her relationship with Defendant.  Nowhere on Defendant's website prior to sale did Defendant disclose the existence of the Defect.  The fact that the Product is defective is material to Ms. Smith.  Further, the fact that the Product purportedly came with a universal USB-C cable was material to Plaintiff.  If the product packaging or Defendant's website had disclosed the Defect, then Ms. Smith would not have purchased the Product, or would not have purchased it on the same terms.  Plaintiff's Product has now been subject to two recalls due to the Defect.  At this point, Plaintiff has lost confidence in the reliability and safety of the Product, and is no longer able to use it at all.  Twice, Plaintiff has been instructed to take the Product away from her child and lost use of the Product.  Further, the Product has lost virtually all, if not all, of the resale value that it had due to the Defect.  Plaintiff does not feel qualified to safely replace the battery according to the second Recall, and has stopped use of the Product as a result.  Further, Defendant was required to replace the Product or itself fix the Product pursuant to the Product Guarantee, but has refused to do so, in breach of its warranty.

6.      Plaintiff Alice Mintz ("Illinois Plaintiff") is a citizen of Illinois, residing in Chicago. Plaintiff Mintz purchased a Yoto Mini on Amazon's website through Defendant's Yoto "Store" on Amazon's website in September 2022.  Before purchasing the Product, Plaintiff Mintz reviewed Defendant's advertising on Amazon's website concerning the Yoto Mini, including that the Product was compatible with a USB-C Cable, which was included.  Nowhere on Defendant's Amazon webpage for the Product prior to sale did Defendant disclose the existence of the Defect. The fact that the Product is defective is material to Ms. Mintz.  Further, the fact that the Product purportedly was compatible with a universal USB-C cable was material to Plaintiff.  If the product packaging or Defendant's Amazon webpage disclosed the Defect, then Ms. Mintz would not have purchased the Product, or would not have purchased it on the same terms.  Plaintiff's Product has now been subject to two recalls due to the Defect.  At this point, Plaintiff has lost confidence in the reliability and safety of the Product, and is no longer able to use it at all.  Twice, Plaintiff has been instructed to take the Product away from her child and lost use of the Product.  Further, the Product has lost virtually all, if not all, of the resale value that it had due to the Defect.  Plaintiff does not feel qualified to safely replace the battery according to the second Recall, and has stopped use of the Product as a result.  In any case, despite requesting a replacement battery through the Recall website on December 12, 2024 (the same day of the Recall), Plaintiff has not received one. Further, Defendant was required to replace the Product or itself fix the Product pursuant to the Product Guarantee, but has refused to do so, in breach of its warranty.

7.      Plaintiff Catherine Rahimian ("California Plaintiff") is a citizen of California, residing in Laguna Hills.  Plaintiff Rahimian purchased a Yoto Mini on Amazon's website through Defendant's Yoto "Store" on Amazon's website in October 2023.  Before purchasing the Product, Plaintiff Rahimian reviewed Defendant's advertising on Amazon's website concerning the Yoto Mini, including that the Product was compatible with a universal USB-C Cable, which was included.  Nowhere on Defendant's Amazon webpage for the Product prior to sale did Defendant disclose the existence of the Defect.  The fact that the Product is defective is material to Ms. Rahimian.  Further, the fact that the Product purportedly was compatible with a universal USB-C

cable was material to Plaintiff.  If the product packaging or Defendant's Amazon webpage disclosed the Defect, then Ms. Rahimian would not have purchased the Product, or would not have purchased it on the same terms.  Plaintiff's Product has now been subject to two recalls due to the Defect.  At this point, Plaintiff has lost confidence in the reliability and safety of the Product, and is no longer able to use it at all.  Twice, Plaintiff has been instructed to take the Product away from her child and lost use of the Product.  Further, the Product has lost virtually all, if not all, of the resale value that it had due to the Defect.  Plaintiff does not feel qualified to safely replace the battery according to the second Recall, and has stopped use of the Product as a result.  Indeed, upon receiving the replacement battery kit pursuant to the Recall, and taking her Product apart pursuant to the instructions provided, she noticed that there appeared to be glue in some of the ports that she believed would affect the security, reliability, and safety of the Product if she tried to use it.  Accordingly, Plaintiff could not complete the repair herself, and has lost all use of the Product.  Further, Defendant was required to replace the Product or itself fix the Product pursuant to the Product Guarantee, but has refused to do so, in breach of its warranty.

8.      Plaintiffs have no past or present financial, employment, familial, or other relationship with any of the attorneys in this action that would create a conflict of interest with the proposed class members.

9.      Defendant Yoto Inc. is a New York corporation, with its primary place of business located at 228 Park Ave S #48734, New York, NY 10003.  It is engaged in the business of designing, manufacturing, producing, advertising, selling, and/or distributing the Products at issue, as well as other children's speakers and accessories.  The Products were manufactured in China, and sold nationwide in the United States (as well as internationally), including in New York.

### III.  JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and most members of the proposed

class are citizens of states different from the state of Defendant.  Defendant has sold hundreds of thousands of the Products throughout the country.

11.      This Court has general jurisdiction over Defendant because its principal place of business is in New York, and because it is incorporated in New York.  Further, the Court has general jurisdiction over Defendant because Defendant conducts substantial business within New York such that Defendant has significant, continuous, and pervasive contacts with the State of New York.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise of the claims herein ocurred in this District, and because Defendant has its principal place of business in this District.

## IV.  FACTS COMMON TO ALL CAUSES OF ACTION

13.      **Products at Issue:** Yoto Minis are advertised as compact screen-free audio players meant for children ages 3-12, geared at parents seeking to minimize overstimulation of their children by intentionally omitting a microphone, camera, a screen, and any advertising.  The devices are primarily used to play audio files (primarily children's stories and songs) which need to be purchased separately (at high prices), but can also be used to play white noise, serve as alarm clocks, and as Bluetooth speakers.  The Products can play sound through a built-in speaker or via Bluetooth enabled headphones.  The Products retailed for $69.99 during the class period, with parents typically needing to shell out hundreds more dollars on Yoto's proprietary audio cards.[1]  A depiction of a Yoto Mini is displayed below:



---

[1] For instance, an audio card of songs from Disney's famous Encanto movie costs $14.99. Assembling a "library" of such audio cards has cost each of the Plaintiffs (and most other class members) hundreds of additional dollars.

14.     The affected Yoto Minis at issue in this case (the "Products") are all Yoto Minis subject to the April 11, 2024 and December 12, 2024 Recalls, as announced on the Consumer Product Safety Commission ("CSPC") website.  The Products were sold nationwide on Yoto's website us.yotoplay.com, Amazon.com, Target.com, and maisonette.com, and in toy and gift stores nationwide from November 2021 through April 2024 for $69.99.  The model name is Yoto Mini, SKY PRPLXX00860, which is listed on the base of the Products.

15.     Defect at Issue:  Per the CPSC, the Products' "lithium-ion battery can overheat and catch fire, posing burn and fire hazards to consumers."

16.     In the December 2024 Recall announcement, the CPSC website stated that "Yoto has received nine reports from U.S. consumers and three from a UK consumer of the speaker overheating or melting."  However, Defendant has receive countless more reports of the Defect manifesting in the Products sold in the United States.

17.     The Defect affects all 251,165 units of the Products sold in the United States. Defendant and the CPSC have now twice instructed consumers to "immediately stop using the recalled speakers" and to "take them away from children," *even if* they followed all instructions for the putative "repair" in the April 2024 recall.

18.     This is a defect in materials, workmanship, and/or design.

19.     The cause of the defect is the same for all of the affected Products at issue.

20.     **Relevant Time Period:**  All of the omissions at issue here were uniformly and consistently made at all times during preceding and during the sale of the Products between November 2021 through April 2024.  There have been no material changes to the product packaging or other consumer facing materials during the relevant period.

21.     **The Problematic Recalls Do Not Moot Plaintiffs' Claims:**  The Products have been recalled twice in the United States, first on April 11, 2024, and then again on December 12, 2024, each time due to the same Defect caused by the speaker's lithium-ion battery overheating and catching fire.  Neither of these recalls in any way mooted Plaintiffs' or class members' claims.

22.    In the April 11, 2024 Recall, Defendant stated that the "speaker's lithium-ion battery can overheat and catch fire, posing burn and fire hazards to consumers."[2]  Defendant stated that "Consumers should immediately stop using the recalled speakers, take them away from children, and contact Yoto to receive a free replacement smart charging cable."  Defendant refused to provide refunds, refused to replace the Products, and refused to effectively repair the Products. As shown by the December 2024 Recall, Defendant's proffered solution of doing nothing but providing one free charging cable did not fix the root of the Defect, and the Products continued to be defective.

23.    Simultaneously with the CPSC Recall, Defendant made a "Yoto Announcement" about the issue on its "Yoto Space" on its webpage, a place designed specifically for Defendant to engage directly with its customers.[3]  Defendant stated that they were "aware of an issue which may affect the battery in Yoto Minis."  At the time, Defendant stated, "Please be assured this does not mean you have to send your Yoto Mini back. Instead we have developed a hardware and software solution to mitigate the issue. We will be providing a replacement charging cable - the Yoto Mini Smart Cable - which is available to all Yoto Mini owners for free, from today. We will be notifying all customers directly but, most of all, we wanted to write to the community directly to apologize, and explain. We're very sorry for the concern and hassle we know this will cause."  Defendant stated that the issue stemmed from batteries sourced from one particular supplier, and that it had stopped all shipments from that supplier.  Defendant also stated that new cable would "ensur[e] it doesn't reach a high state of charge" to minimize the risk of overheating.

24.    Defendant stated, "In total, we have received seven reports directly from Yoto customers of battery failures in Yoto Minis. Six of these were in the US and one in the UK."  Defendant went on to say: "The affected customers have been incredibly helpful in assisting us with the investigations and every affected customer has had replacement Yoto players."  But that is not what happened.  In fact, other than the apparently seven total customers worldwide that

---

[2] https://www.cpsc.gov/Recalls/2024/Yoto-Recalls-Yoto-Mini-Speakers-for-Children-Due-to-Burn-and-Fire-Hazards
[3] https://yoto.space/news/post/important-yoto-mini-news-from-the-yoto-founders-TKqtwFzndyUveGx

received replacement Yoto Minis, which was required by Defendant's Product Guarantee, Defendant refused to offer that same remedy to a single other affected customer.  Defendant was explicit that it was not offering replacement products to class members.

25.    Consumers were swift in telling Defendant that its proffered solution was inadequate.  Directly below Defendant's announcement, a flurry of customer responses followed, such as:

"This is the wrong way about going this. This device has a bad battery and anyone who charges it without the knowledge of this issue is at risk. Awful approach. I won't be buying any more Yoto products."

"I am disappointed in the following:

1 - A replacement cable whilst it does mitigate the problem, materially changes the product in specification and intended use from the one we purchased as it now creates a proprietary charging cable requirement removing the "Universal" cable.  This has the effect of requiring us to travel with a proprietary cable - rather than simply bringing the unit alone and using an available USB-C and makes the Yoto mini much less travel friendly.

2- Your own product guarantee offers a "replacement or repair" and whilst a new cable augments the functionality of the device to mitigate the product issues it does not "repair" it.  A repair would allow us to continue to use the device as it was originally specified (USB-C charging).  Note requiring a proprietary cable although using USB-C connector is no longer a USB-C compliant charging solution.
on this… as the connector is still to remain USB-C and have no modification how does the consumer know to only use the new smart cable and what mitigations are in place - will the unit now only recognise the smart cable and not function at all with a standard cable? What happens if a greandparent for example is not aware of this and attempts to use a standard cable?

3- You have stated partially (and not up front - hidden in my opinion) in the recall information that part of the fox is capping the battery charge capacity and that you hope in the future with software fixes that battery life won't be affected too much… how much is it currently affected!!?  Again a repair should return the device to the same specification as before the repair was required and less battery life in combination with the requirement to be tethered to a specific cable to charge is unacceptable for a travel player!

4- you have specified you chose this option to resolve as the fastest, and that it may well be but it is a much poorer solution than offering replacement players and I believe you have done this for primarily cost reasons and not speed of resolution for your customers - offer

me a choice of waiting for a replacement product if that is the case! For me this feels like an attempt to minimise the financial impact of the recall not provide the best resolutions'."

"I would also like to point out the following:

Product Guarantee (https://uk.yotoplay.com/product-guarantee)

*What it covers*

*The General Yoto Product Guarantee covers the repair or replacement (at Yoto's discretion) of your Yoto product within 24 months from the date of original purchase:*

- 
- *if it has been used in the manner intended and*
- 
- ***is found to be defective due to faulty materials or workmanship*** *(excluding memory storage defects, see further below).*

*The Memory Storage Yoto Product Guarantee covers the repair or replacement (at Yoto's discretion) of your Yoto product within 48 months from the date of original purchase:*

*if it has been used in the manner intended, and*
*is found to be defective specifically in relation to the memory storage, including "SD Fail"*

*If your product is out of stock and/or a repair or replacement is not possible at that time, you will be offered an alternative product (of equal or higher value). If you do not wish to accept this, when your product is back in stock we will send a replacement.*

*Your statutory consumer rights are not affected by this guarantee.*

*Yoto reserves the right to replace your faulty product by sending you a refurbished one, tested and graded.*

As mentioned before, the requirement to now ONLY use a specific charging cable, not a generic USB-C, is not a solution to a battery that ***is found to be defective due to faulty materials or workmanship.***

We love your products, we love this community. My daughter averages 3 hours a day of usage with her mini.

But, I can **not** rest assured that she is not going to get hurt by a faulty battery.

We understand the predicament you are in and want Yoto to succeed. But to us, your loyal customers, a reduction in battery life, a new cable that must be used and can be lost and may not be the length we require, is not the service we have come to know and love.

A repair service at the very least must be offered."

CLASS ACTION COMPLAINT                                                                    9

"I think all the users will agree on this, as will Yoto no doubt. I received the inevitable response back from their "Customer Happiness Specialist" that they were sticking to their plan - which is of course disappointing.

I still call on Yoto to offer customers an actual repair (not an ancillary proprietary cable) in the future.

…it will be interesting to see then when the mini is back on sale whether it appears with the smart cable included or if there is a Gen2, upgraded ("repaired") version that does not require a smart cable. That will confirm whether Yoto internally actually believes the smart cable to be a satisfactory "repair".

I suspect a new upgraded "safe" player is released and if there is no replacement route for current "unsafe" models (other than a mitigation through the cable) users would understandably be further disappointed I feel."

"I'm so sad about how all of this is going. I totally agree with the other commenter that this response seems like you don't know your customers very well. We are a pretty devoted bunch, and let's be honest if you go out of business we will have some pretty useless plastic cards. The other commenter who said if you did a "pay what you can afford" option they would gladly pay full price I would guess represents more of your customers than not. I would be ok if you said you can't afford to replace them all right away. But if I know down the road I will be able to get a replacement I would be happy to wait with the cable until that time (possibly on an order of purchase basis). I think knowing that selling more is important we would understand that you wouldn't be able to use your full inventory of new products to replace ours all at once - but if we knew a percentage were being used to replace them as new ones are made we would be understanding. I feel like you have an opportunity to bring the YOTO community together. We are all in a position where we could lose something (granted it's a company vs a product for you, but we are still invested and want you to survive this). If you were to reach out to your community and ask for support and understanding I think you would find plenty. What is hurting you right now isn't the actual recall, it's that the tone of your response feels like "this is it, here's your cable why aren't you more grateful". Or asl sense that you know we are invested in cards so you think we will eventually just deal with this because we are stuck. You don't want people to feel stuck. You want them to be your advocates (I tell everyone I know with kids how much we love ours). Be open, explain what you can and can't do and ask for support. Worst case you go out of business but not for not trying and not with the reputation you are gaining currently."

"I appreciate the communication and have mixed feelings about the proposed solution, but am not as upset as others. I think you're in a difficult situation and there are plausible sequences of events where you did all the usual, by-the-book, best practices with your design, quality engineering and suppliers, yet still ended up with this problem on your

hands. That's where I have a hard time feeling entitled to a resolution as costly as a replacement unit. At the same time I know that this is not just a hypothetical safety risk— our Minis are affected. The existence of this Smart Cable really does mean the product is unsafe to use with any other certified Type-C cable.

This is definitely inconvenient, and more so for our use of the Mini while traveling than our 2nd gen which can more easily charge at the same position at home. Part of how our cables are able to last a long time is that we avoid having to drag them around, packing and unpacking them across all the distinct contexts and locations where charging is needed. We bought the Mini explicitly so that we could charge it in a way that we couldn't then 2nd gen. Cable in the car that's always there. Cable with the portable battery charger when needed. Cable in the hotel room or cabin that their parents keep in the suitcase and carefully stow between visits. Traveling with the Mini now means dragging the cable around, where it will be wrapped and unwrapped, put in pockets, at risk of exposure to the elements or otherwise out of reach when needed.

I still love our players (we also have an 3rd gen) and overall experience for our family, but our Mini really just became a significantly different product. Like I said, mixed feelings. I really hope you consider a 50% off trade-in program or something as an alternative to the free Smart Cable, which itself has a material impact on fulfillment and logistics that could help offset the margin hit on the hardware and increase in backorders to net new customers."

"Why does Yoto's solution not align with its Product Guarantee?"

There is clearly a defect with the Mini.

Sending a new cable is not a 'repair' when the old cable wasn't defective.

People should either be able to actually get the Mini repaired, replaced, or be provided with an alternate product of equal or greater value."

"Sorry but the proposed solution is not acceptable. Quite simply the Yoto mini was advertised as being charged by USB C (the "U" standing for "universal" as has already been pointed out). This was a material part of my decision to purchase and the the loss of this functionality is not acceptable.

Even if it was acceptable, it is a horrible move for a kids' brand to propose leaving devices with unsafe batteries out there in users' homes - not good enough."

"Agree with others here, I'm not satisfied with this outcome. The U in USB is for "Universal", if it isn't safe to use a standard cable it isn't safe at all. The cord isn't defective, the device is defective and should be replaced."

"Dear Yoto,

Thank you for contacting me about the recent Yoto Mini recall. I understand that the proposed solution is to offer a smart charging cable that will prevent the Yoto Mini from overheating. This is not an acceptable solution.

Charging cables get lost, they break, they're left in hotels — it's something we all deal with. It's why a universal serial bus (USB) exists — so that when you lose your cable, it's not a big deal to use another one. It is a huge hassle to have to keep track of a specific cable or risk injury or fire.

Further, there is no way a child or an uninitiated user (e.g. a babysitter, or a grandparent) would know that the Yoto Mini requires a special cable to be safe. There is no label, no warning, and no reasonable expectation that someone uninformed could even know which is the special, safe cable. So you're not only expecting us to keep track of the special cable, you're also requiring me to inform everyone who is in my home that this device must use this cable or be a fire and injury hazard. Does that seem reasonable to you?

If the only way our Yoto Minis are safe is to use them with a special cable, then they are not the products we paid for. Frankly, it is also not a safe solution and will open your company up to lawsuits should a problem occur.

If the newly manufactured Yoto Minis are safe to use with a standard USB-C charging cable, then the reasonable and safe solution is to replace the player. I understand that this will cost your company more money, but it is the right thing to do.

You say you are committed to putting things right — I hope you mean that, and that you do the right thing. Replace our players, not just the cable."

26.    Facing the slew of customer criticism, Defendant's Community Manager responded on the same community page: "Thanks for sharing your concerns. I appreciate it's disappointing not to have the flexibility you're used to, but we're confident this solution is sufficient: introducing the Smart Cable solves the problem entirely, with minimum disruption to Yoto Mini users. This solution has been fully approved by the US regulator, CPSC.  In comparison, replacing the battery would take a considerable amount of time and added complexity."

27.    But of course, this statement was false.  The replacement of the cable did not "solve[] the problem entirely."  And, it did absolutely nothing to address customer disappointment about being sold a product that was advertised as being compatible with a USB-C, but then being required to use a proprietary cable that was not USB-C.[4]  USB-C compatibility holds significant

---

[4] *See* https://www.pcmag.com/how-to/what-is-usb-c-an-explainer (explaining the use, benefits, and adoption of USB-C cables).

value to consumers.  Defendant's elimination of that feature through the April 2024 Recall decreased the value of the Products significantly.

28.    Defendant knew at the time of the April 2024 Recall that it was not sufficient to address the Defect.  Indeed, less than three months later, Defendant instituted a recall of these same Yoto Minis in Australia due to the exact same Defect.[5]  Defendant noted that "There is a risk of serious injury or property damage from fire if the battery overheats while charging.  Fires with associated property damage have occurred."  Unlike the United States Recall, Defendant instructed its Australian customers to immediately stop using the products and *replace the batteries*.  There was no mention of replacing the cable as part of the Australian recall.  Despite requiring its Australian customers replace the batteries on July 5, 2024, Defendant continued gaslighting its United States customers until December 2024 by representing that the cable "fix" was sufficient to address the Defect and that a battery replacement was not required.   Indeed, Defendant's official position in the United States during this period was that the cable alone, without a battery replacement, would "solve[] the problem entirely."

29.    But of course, the new cables did not "solve" the problem.  After receiving reports of the Products continuing to overheat and catch on fire even when using the replacement cables, Defendant announced another recall in the United States on December 12, 2024.[6]  Again, Defendant instructed its customers to "immediately stop using the recalled speakers" and "take them away from children."  These instructions applied even to those customers "even if they already received the smart cable in the April 2024 recall."  According to Defendant, "[t]his is because there has been a very small number of additional reports of overheating and, in some cases, the Smart Cable was being used."[7]  Defendant claimed that "[i]t remains the case that no injuries or reports of overheating leading to any fires have been received."[8]  As discussed above,

---

[5] https://www.productsafety.gov.au/recalls/yoto-mini-2021-2023-edition
[6] https://www.cpsc.gov/Recalls/2025/Yoto-Reannounces-Recall-of-Yoto-Mini-Speakers-for-Children-Due-to-Burn-and-Fire-Hazards-New-Full-Battery-Replacement-Kit-Now-Available
[7] https://us.yotoplay.com/recall
[8] https://yoto.space/news/post/important-yoto-mini-2021-2023-update-from-the-yoto-founders-zJ1zP31cXkNIxLN?_gl=1*1wzg4mv*_gcl_au*MTU0NzUzMDkxOC4xNzM0MzcxNTg0*_ga*MTQwMDI1ODkxNy4xNzM0MzcxNTg0*_ga_55TH5WXZ5Q*MTczNjQ1MzEyMi4xMi4xLjE3MzY0NTMzMjEuMzQuMC41OTgxMzg5Mw..

this was blatantly not true, as Defendant admitted in its Australian recall announcement that "[f]ires with associated property damage have occurred."

30.    In the December 2024 Recall, customers were instructed to contact Yoto to receive a battery replacement kit, and not operate the Products until receiving the kits and installing the new batteries.  Defendant billed the battery replacement process as simple and straightforward, but it is anything but.   Indeed, only six months prior to the December 2024 Recall, a customer reported that Yoto had specifically instructed him that Yoto "do[es not provide replacement batteries as they seem concerned with safety issues related to people trying to install new batteries."[9]  The customer went on, "This is understandable as the unit clearly isn't built to have a user replace it."

31.    The replacement process is no easy task, and reasonable, ordinary customers cannot be expected to safely perform this process themselves.[10]  A summary is provided below:

First, customers are to remove the rubber "feet"



<hr />

[9] https://www.reddit.com/r/YotoPlayer/comments/1dax70v/regarding_replacement_batteries_for_the_yoto_mini/

[10] https://us.yotoplay.com/mini-battery-replacement-kit-how-to-guide (Yoto's step by step guide)

1

2

They are then required to unscrew the case, as displayed below



They then have to pry the Products open by force, as displayed below



1

According to Defendant's instructions, "[m]oderate force is required"

2

3

4

5

6

7

8

9

10

11



12

Then, customers must remove more screws found on each side of the battery

13

14

15

16

17

18

19

20

21

22



23

24

25

26

27

28

Then they are required to pry the battery off of its place



They are then required to "gently pull the battery assembly away from the body of the Mini to reveal the two cables and their sockets. Note that cables connected to the larger plug may or may have black insulation padding."



Next, they must "Remove the two cables from their sockets with your fingers. Plugs may be **glued in place**, but they can be removed by gently moving the connectors, side to side, to help loosen from the sockets."





Customers are warned "Warning: Do not damage or pierce the battery. Do not reuse the defective battery or keep as a spare. Old batteries must be disposed of at a battery recycling center. Do not dispose of the old battery via household waste as this is a fire risk.



Next, customers are instructed: "With the new battery assembly, attach the two plugs to the sockets shown. Attach the smaller plug with the terminals facing upward and attach the larger plugs with the terminals facing downward or the equivalent. **_Important_** - Please make sure the connectors are securely attached."



The images show that customers must be extremely carefully to insert the plugs just the right amount, and in the right direction.  The differences are barely perceptible.

 

 

 

 

Next, customers are told: "Once cables are attached, gently push the battery assembly into the Yoto Mini. Please ensure that the NFC reader opening on the new battery assembly is at the top of the Yoto Mini and that the wires are not trapped or pinched when the battery assembly is in place."



Next, they must replace the screws on the sides of the battery



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, customers are required to re-fit the case, insert more screws, and attach new rubber feet







32.    No reasonable consumer would ever have anticipated having to perform this sort of complex procedure when purchasing the Products, and the average consumer is not capable of safely following these instructions.  And, as discussed herein, the requirement that customers perform this complex repair process is directly at odds with Yoto's Product Guarantee, where Defendant promised its customers that it would replace the Products or repair them free of charge itself.

33.    The Recalls do not render this lawsuit moot because they do not provide all of the same relief available in this lawsuit.  No refunds are provided under the recalls.  The Recalls are in direct breach of Defendant's obligations under the Product Guarantee, and further result in Products that are worth less than what Plaintiffs and customers bargained for.  The Recalls are also useless for someone who does not trust the Product, or no longer owns the Product.

34.    The Recalls do not provide for statutory damages available under consumer protection laws, or disgorgement of profits under an unjust enrichment theory.

35.    The amount and reach of the publicity concerning the notice of Recalls was not comparable to the typical notice provided in  a class action.

36.    **The Misrepresentations:**  The Products were uniformly marketed and labeled as being compatible with a universal USB-C cable.  However, due to the April 2024 recall, consumers were instructed that they could no longer use universal USB-C cables, but instead were required to use only Yoto branded special cables that were designed to purportedly slow or prevent overheating of the Products' batteries, and to prevent a "high state of charge."  This significantly downgraded the functionality of the Products, as consumers value and prefer Products that are compatible with generic, universal USB-C cables, so that they do not have to entirely stop using the product in case a branded cable is lost or damage – and so that they did not have to vigilantly monitor children and caretakers to ensure that only the Recall-approved cable would be used in the future.

37.    The Products also came with an express warranty, which became a basis of the bargain and part of the contract between consumers and Defendant.  The express warranty is titled

"Product Guarantee" on Defendant's website, and has appeared there at all times during the class period. Indeed, the Product Guarantee is still on Defendant's website as of the date of the filing of the Complaint.[11] The Product Guarantee states as follows:

**Product Guarantee**

**What it covers**

The Yoto guarantee covers the repair or replacement (at Yoto's discretion) of your Yoto product if it has been used in the manner intended, and is found to be defective due to faulty materials or workmanship within 2 years from the date of original purchase.

Your statutory consumer rights are not affected by this guarantee.

**What it doesn't cover**

- Normal wear and tear
- Accidental damage
- Damage from external sources such as transit, weather, electrical outages or power surges
- Direct or indirect faults caused by:
  - Negligent use, misuse, neglect or careless operation
  - Use of the Yoto product not in accordance with the user manual
  - When used with other products or parts that are not part of the Yoto family
  - If the product has been taken apart for any reason including attempted repairs carried out by parties other than Yoto
- Natural degradation of battery performance over time
- That Yoto products will at all times operate without interruption or error
- A transfer in guarantee is not valid in the case of resale of the Yoto product

**Eligibility for the Yoto guarantee**

- The Yoto guarantee becomes effective at the date of purchase (or the date of delivery if this is later)

---

[11] https://us.yotoplay.com/product-guarantee

- Proof of delivery / purchase must be provided before any work can be carried out under the guarantee. Without proof, any work carried out may be chargeable. Please keep your purchase receipt or delivery note
- All work will be carried out by Yoto or a representative appointed by Yoto
- For product sent to Yoto or their representative for repair, any original parts that are replaced, faulty, or otherwise, become the property of Yoto. The product with repaired or replaced parts remains the property of the consumer
- The repair or replacement of your Yoto product under guarantee will not extend the period of the guarantee
- The terms of our return, repair and replacement process are covered by the Returns Process
- The guarantee provides benefits which are additional to and do not affect your statutory rights as a consumer.
- The guarantee covers domestic use of the Yoto product only

38.     But Defendant has refused to honor the Guarantee, and instead has breached the Guarantee by offering only the limited options available through the Refunds.  In the April 2024 Recall announcement, Defendant instructed consumers to cut and discard their universal USB-C cables and instead use Defendant's new Recall-approved cables, and refused to repair, replace, or refund the Products.  And then in the December 2024 Recall, Defendant instructed consumers to replace the battery by themselves, and again refused to repair, replace, or refund the Products. Defendant has refused to honor its Guarantee, as the mandated repairs of the Products are not "carried out by Yoto or a representative appointed by Yoto."  Further, Defendant has refused to honor the Guarantee as it has refused to replace or to refurbish the defective Products, despite the Defect being "found to be defective due to faulty materials or workmanship within 2 years from the date of original purchase."

39.     **The Omissions:** Defendant failed to disclose that due to a defect in the materials, workmanship, and/or design, that the Products contained a Defect and could not be used for their

principal and only intended purpose – as children's toys. This Defect results in an unreasonable risk of burn injury. This material fact was concealed and/or suppressed by Defendant.

40. The omission pertains to an unreasonable safety hazard that reasonable consumers consider to be material.

41. Plaintiffs and class members would not have bought the Products, or would not have bought them on the same terms, if the Defect had been disclosed. The materiality of the Defect also is demonstrated by the existence of now two Recalls.

42. Defendant did not disclose the Defect on the product packaging, the product page of its website, the owner's manual, the product pages of other retailers who acted as Defendant's agents, or in any other customer-facing document. Sales personnel and customer service representatives at brick and mortar locations did not disclose the Defect and no other signage or labeling did either.

43. At the time of purchase, Plaintiffs and class members did not know and did not have reason to know that the Products were defective. Defendant had exclusive knowledge of that fact.

44. Defendant made partial representations to Plaintiffs and class members, while suppressing the safety defect. Specifically, by describing the Products features with language suggesting that they were safe and appropriate to use as children's toys, the product packaging and product webpages implied that they were suitable as children's toys, without disclosing that they had a critical safety-related defect related to the battery.

45. **Defendant's Pre-Sale Knowledge of the Defect:** Defendant was aware of the defect at the time of sale.

46. Before the Products were first launched, Defendant knew about the defect because of pre-release testing.

47. After launch, Defendant monitored a variety of sources of information to detect signs of defects. These sources of information include warranty claim data, customer complaints to Defendant, replacement part data, and field reports. Defendant knows that for every complaint made, there is a statistical likelihood that there were many more unreported incidents, and

1    Defendant made projections about the likely manifestation rate and future warranty claims based

2    on the number of known complaints.

3        48.    The customer complaints about the Products also would have put Defendant on

4    notice of the defect and contributed to its pre-sale knowledge of the defect, because the Defect is

5    the same or substantially similar in all material respects. The number of reports about the Defect

6    was significant. The fact that so many owners worldwide made similar complaints indicated that

7    the complaints were not the result of user error or anomalous incidents, but instead a systemic

8    problem with the Product's batteries. The reports and complaints from owners were similar enough

9    to put Defendant on notice that the incidents described were the result of a Defect, and that the

10   Products were experiencing unusually high levels of complaints.

11       49.    Defendant also monitored and would have known about consumer complaints to the

12   CPSC. When a consumer posts a complaint on the CPSC website, all of the relevant information

13   provided to the CPSC is automatically sent via email to the manufacturer and retailers. Monitoring

14   complaints to the CPSC is standard industry practice that serves as an early warning mechanism to

15   spot defects that cause safety hazards, and Defendant adheres to that practice.

16       50.    In short, Defendant knew with certainty that the defect would manifest and continue

17   to plague consumers who purchased the products at issue.

18       51.    **No Adequate Remedy at Law:**  Plaintiffs and members of the putative class are

19   entitled to equitable relief because no adequate remedy at law exists.

20       52.    Legal remedies are inadequate because they are not equally prompt and certain and

21   in other ways efficient as equitable relief.

22       53.    Damages are not equally certain as restitution because the standard that governs

23   restitution is different than the standard that governs damages. Hence, the Court may award

24   restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an

25   award of damages.

26       54.    Damages and restitution are not the same amount. Unlike damages, restitution is not

27   limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest.

28

CLASS ACTION COMPLAINT                                                    27

1  Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing,
2  even where the original funds taken have grown far greater than the legal rate of interest would
3  recognize. Plaintiffs seek non-restitutionary disgorgement of profits in connection with their unjust
4  enrichment claims.

5      55.    Legal claims for damages are not equally certain as restitution because equitable
6  claims entail few elements.

7      56.    In short, significant differences in proof and certainty establish that any potential
8  legal claim cannot serve as an adequate remedy at law.

9                      **CLASS REPRESENTATION ALLEGATIONS**

10      57.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23
11  on behalf of a Class consisting of all persons in the United States who, within the applicable statute
12  of limitations and the date that class notice is disseminated, purchased one of the Products.

13      58.    Plaintiff Smith also seeks to represent a subclass defined as all members of the Class
14  who purchased the Product in New York (the "New York Subclass").

15      59.    Plaintiff Mintz also seeks to represent a subclass defined as all members of the Class
16  who purchased the Product in Illinois (the "Illinois Subclass").

17      60.    Plaintiff Rahimian also seeks to represent a subclass defined as all members of the
18  Class who purchased the Product in California (the "California Subclass").

19      61.    Plaintiffs also seek to represent a "Multi-State Consumer Protection Class" defined
20  as all people who purchased the Product (1) in the states of Michigan, Minnesota, or New Jersey
21  within the applicable statute of limitations; (2) in the state Missouri within the applicable statute of
22  limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the
23  applicable statute of limitations; (4) in the states of Illinois and New York within the applicable
24  statute of limitations.

25      62.    Plaintiffs also seek to represent an "Multi-State Implied Warranty Class" defined as
26  all persons who purchased a subject Product for personal, family, or household use: (1) in Alaska,
27  Arkansas, California, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Michigan,

28

Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, or Wyoming within the applicable statute of limitations; or (2) in Colorado or Massachusetts within the applicable statute of limitations.

63.    Plaintiff reserves the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.  Pursuant to Fed. Civ. P. 23(c)(1)(C), each of the above class definitions is a placeholder that may be altered or amended at any time before final judgment. Subject to additional information obtained through further investigation or discovery, the above-described Classes may be modified or narrowed as appropriate, including with the use of different multi-state subclasses to account for material variations in state law, if any.

64.    Excluded from the putative classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.  Also excluded are any claims for personal injury.

65.    Plaintiffs are members of the Classes they seek to represent, as applicable.

66.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class, but believe there are hundreds of thousands of class members based on the figures provided in the Recalls.  The number of putative class members is believed to be so numerous that joinder of all members is impractical, and at least higher than 40.

67.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

     a.    Whether Defendant knew or should have known of the defect at issue in this case, and if so, when they discovered the defect;

b. Whether the defect at issue in this case would be material to a reasonable person, because, among other things, it poses an unreasonable safety hazard;

c. Whether Defendant failed to disclose and concealed the existence of the defect from potential customers;

d. Whether Defendant's conduct, as alleged herein, violates the consumer protection laws asserted here.

68. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Classes sustained damages as a result of Defendant's uniform wrongful conduct.

69. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel that are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes.

70. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

## COUNT I

### Violation of New York's Consumer Protection Act,

### New York General Business Law § 349, et seq.

71. Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

72.     Plaintiffs bring this cause of action individually and on behalf all other class members.

73.     By reason of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

74.     As alleged above, Defendant engaged in fraudulent conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

75.     The public is likely to be damaged because of Defendant's deceptive trade practices or acts.

76.     Defendant directs the conduct at issue here at consumers.

77.     Defendant's deceptive acts affect the public interest in the state of New York because consumers purchased the Products here, and because Defendant and has a principal place of business here and is incorporated here.

78.     As a result of Defendant's use of employment of deceptive acts or business practices, Plaintiffs and each of the other Members of the classes have sustained damages in an amount to be proven at trial.

79.     Plaintiffs seek on behalf of herself and all putative class members, all relief available under GBL § 349.

## COUNT II
### Violation of New York's False Advertising Law,
### New York General Business Law § 350, et seq.

80.     Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

81.    Plaintiffs bring this cause of action individually and on behalf all other class members.

82.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

83.    Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

84.    Based on the foregoing, Defendant engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of New York's General Business Law § 350.

85.    Defendant's false, misleading, and deceptive statements and representations of fact were and are directed towards consumers.  Defendant also actively concealed and knowingly admitted material facts regarding the true nature of the Product.

86.    Defendant's omissions were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

87.    Defendant's omissions have resulted in consumer injury or harm to the public interest.

88.    As a result of Defendant's conduct at issue here, Plaintiffs and class members have suffered and continue to suffer economic injury.

89.    As a result of Defendant's violations, Plaintiffs and class members have suffered damages due to said violations because: (a) they would not have purchased the Product on the same terms if they knew that the Product had a dangerous defect and are not safe for use; (b) they paid a premium price in the amount of the full purchase price of the Products; and (c) the Product does not have the characteristics, uses, benefits, or qualities as promised.

90.     Plaintiffs seek on behalf of themselves and all putative class members, all relief available under GBL § 350.

**COUNT III**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

91.     Plaintiffs repeat their prior allegations of this Complaint and incorporate them by reference herein.

92.     California Plaintiff brings this cause of action individually and on behalf all other class members in the California Subclass.

93.     California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

94.     Defendant acted with knowledge and intent.

95.     California Plaintiff alleges a claim under all three prongs of the UCL.

96.     As alleged above, Defendant engaged in fraudulent conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

97.     Defendant's conduct also constitutes "unfair" business acts and practices within the meaning of the UCL, in that its conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Defendant's violation of consumer protection and unfair competition laws resulted in harm to consumers.

98.     California Plaintiff also alleges a violation under the "unlawful" prong of the UCL because Defendant's conduct violated consumer protection laws, and the common law as set forth herein.

99.     As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiff and the other members of the California Subclass have suffered out-of-pocket losses.

100.    California Plaintiff and class members have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendant alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here.

101.    California Plaintiff seeks all relief available under the UCL.

## COUNT IV

### Violation of California's Consumer Legal Remedies Act ("CLRA")

### Cal. Civ. Code §§ 1750, *et seq.*

102.    Plaintiffs repeat their prior allegations of this Complaint and incorporate them by reference herein.

103.    California Plaintiff brings this cause of action individually and on behalf all other class members in the California Subclass.

104.    Defendant is a "person" as defined by California Civil Code § 1761(c).

105.    California Plaintiff and the other Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

106.    For the reasons alleged above, Defendant violated California Civil Code § 1770(a)(5)(7) and (9).

107.    California Plaintiff provided pre-suit notice of the claims asserted under the CLRA, in compliance with all of the CLRA's requirements.

108.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business.

109.    Defendant acted with knowledge and intent.

110.    Defendant engaged in conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

111.    With respect to restitution under the CLRA claim, California Plaintiff alleges in the alternative that Plaintiff and Class Members lack an adequate remedy at law for the reasons already alleged above.

112.    As a result of Defendant's misconduct, California Plaintiff and other Class Members have suffered monetary harm.

113.    Plaintiff seeks all relief available under this cause of action, other than damages. Plaintiff may amend the Complaint in the future to add a damages claim.

### COUNT V

### Violation of California's False Advertising Law ("FAL")

### Cal. Bus. & Prof. Code § 17500, *et seq.*

114.    Plaintiffs repeat their prior allegations of this Complaint and incorporate them by reference herein.

115.    California Plaintiff brings this cause of action individually and on behalf all other class members in the California Subclass.

116.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or

misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

117.    Defendant has represented to the public, including California Plaintiff and members of the California Subclass, through its deceptive packaging and online marketing, that the Products are free of the Defect alleged herein, are fit for the purpose for which the Products would be used, and conform to the promises or affirmations of fact made on the package or label and advertising materials. Defendant also made representations through its Product Guarantee.  Because Defendant has disseminated misleading information regarding the Products, and Defendant knows, knew, or should have known, through the exercise of reasonable care, that the representations Defendant made are false and misleading, Defendant has violated the FAL.

118.    As a result of Defendant's false advertising, Defendant has and continues to unlawfully obtain money from California Plaintiff and members of the California Subclass. California Plaintiff therefore requests that the Court cause Defendant to restore this fraudulently obtained money to Plaintiff and members of the California Subclass to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from violating the FAL or violating it in the same fashion in the future as discussed herein. Otherwise, California Plaintiff and members of the California Subclass may be irreparably harmed and/or denied an effective and complete remedy.

119.    California Plaintiff and members of the California Subclass have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains, and/or other sums as may be just and equitable.

## COUNT VI

## Violation of Illinois Consumer Fraud Act, §§ 815 ULCS 505/1, et seq.

120.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

121.     Illinois Plaintiff brings this cause of action individually and on behalf all other class members in the Illinois Subclass.

122.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), §§ 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

123.     Defendant intended that Plaintiff and each of the other members of the Illinois Subclass would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

124.     As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Illinois Subclass have sustained damages in an amount to be proven at trial.

125.     In addition, Defendant's conduct showed malice, motive, and reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VII

## Breach of Express Warranty

126.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

127.     Plaintiffs bring this cause of action individually and on behalf all other class members.

128.     In connection with the sale of the Products, Defendant issues an express warranty that the Products were compatible with a USB-C and that the Products would be subject to the Product Guarantee, as discussed above.  These representations became part of the basis of the bargain between Defendant and Plaintiffs and Class members, thereby creating express warranties

CLASS ACTION COMPLAINT                                                                37

that the products would conform to Defendant's affirmation of fact, representations, promise, and description.

129.    Defendant breached its express warranty because the Products became incompatible with USB-C's due to the April 2024 Recall, and because Defendant refuses to honor its Product Guarantee by replacing the Products or fixing the Products itself.

130.    Plaintiffs and the Class members were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased the Products if they had known the true facts; (b) they paid for the Products due to the mislabeling of the products; (c) they would not have purchased the Products on the same terms if they had known the true facts; (d) they paid a price premium for the Products due to Defendant's false warranties and affirmations of fact; and (e) the Products did not have the characteristics or qualities as promised.

131.    Plaintiffs served Defendant with written notice of Defendant's breach of warranties within a reasonable time prior to the filing of the Complaint.

### COUNT VIII

### Breach of Implied Warranty of Merchantability

73.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

74.    Plaintiffs bring this cause of action individually and on behalf all other class members.

75.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the products at issue, impliedly warranted that they would pass without objection in trade under the contract description; was fit for the ordinary purpose for which the products would be used; and conformed to the promises or affirmations of fact made on the container or label.

76.    Defendant breached its warranty implied because the products could not pass without objection in the trade under the contract description, they were not adequately labeled

because there was no disclosure of the defect at issue; and they are unfit for their ordinary purpose. As a result, Plaintiffs and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

77.     Plaintiffs Mintz and Rahimian purchased the product through an authorized dealer who was an agent of the manufacturer.  Plaintiffs Mintz and Rahimian were the intended consumers of the product, not the authorized dealer.  The implied warranty was intended to benefit the consumer, not the authorized dealer.  In the alternative, Plaintiffs Mintz and Rahimian purchased directly from Defendant, as they made their purchases through Amazon's Yoto store which is managed by Defendant.  Plaintiff Yoto purchased directly from Defendant.

78.     Plaintiffs Mintz and Rahimian and class members were third party beneficiaries of an implied warranty between Defendant and its authorized dealers. Plaintiff Smith and other direct purchaser class members were direct beneficiaries of the implied warranty.

79.     Defendant and its authorized dealers, including Amazon, have valid and binding contracts for the distribution and sale of Defendant's products.  An implied term of that contract is that the products that Defendant provides to its authorized dealers would pass without objection in the trade under the contract description, are adequately labeled, and fit for their ordinary purpose. The contract between Defendant and its authorized dealers, including the contract with Amazon, is intended to benefit consumers, because if consumers are not satisfied with Defendant's products, then that defeats the primary purpose of the agreement between Defendant and its authorized dealers.  Therefore, the intended benefit to consumers is not incidental, but is a central and immediate purpose of the contract.

80.     Defendant was aware of remote and direct customers' requirements that products work safely and was aware that remote and direct customers generally expected the product to meet minimum standards.

CLASS ACTION COMPLAINT                                                                                    39

81.     An exception to any purported privity requirement applies because this action challenges representations made on the product packaging.  Further, privity is satisfied because Plaintiff Smith purchased from Defendant directly, while Mintz and Rahimian purchased through Yoto's store on Amazon.

82.     Plaintiffs and Members of the Classes purchased the products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

83.     The products were defective when it left the exclusive control of Defendant.

84.     Plaintiffs and class members did not receive the goods as warranted.

85.     The products were not sold on an "as is" or "with all faults" basis.

86.     Any purported disclaimer of implied warranties was ineffective because it was not conspicuous and not made available to the purchaser before the sale of the product.  Instead, if a disclaimer was made at all, it was buried in an owner's manual, which was tucked away in the product packaging and not made available until after purchase.

87.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and class members have been injured and harmed because: (a) they would not have purchased the products on the same terms if they knew that the Product was dangerous; and (b) the Product does not have the characteristics, uses, or benefits as promised by Defendant.

88.     Plaintiffs seek all relief available under this cause of action.

89.     Plaintiffs served Defendant with written notice of Defendant's breach of warranties within a reasonable time prior to the filing of the Complaint.

## **COUNT IX**

### **Fraud**

132.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

133.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

134.    As discussed above, Defendant failed to disclose material facts about the Products, including by failing the Defect.  These omissions and false representations were made with knowledge that the labels are misleading.  Further, Defendant made misrepresentations by stating that the Products would be compatible with USB-C and that they would be subject to the Product Guarantee, even though Defendant refused to honor the Product Guarantee.

135.    The omissions and misrepresentations made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended and actually induced Plaintiffs and Class members to purchase the Products.

136.    The fraudulent actions of Defendant caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT X

## Unjust Enrichment

137.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

138.    Plaintiffs bring this cause of action individually and on behalf all other class members.

139.    To the extent required, Plaintiffs assert this cause of action in the alternative to legal claims, as permitted by Rule 8.

140.    The unjust enrichment claims are premised in part on Defendant's pre-sale activities and are unrelated to their post-sale obligations to provide repairs.

141.    Plaintiffs and the class members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

142.    Defendant knew of the benefit conferred on it by Plaintiffs and the Class Members.

143.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class Members' purchases of the products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the products were dangerous.  This caused injuries to Plaintiffs and class members because they would not have purchased the products or would have paid less for them if the true facts concerning the products had been known.

144.    Defendant is not an innocent third party but instead directly benefited from the unlawful conduct alleged here.  Defendant clearly retained financial benefits from consumers purchasing the products at issue. The relationship between Plaintiffs' and Class Members detriment and Defendant's benefit flows from the challenged conduct alleged in this Complaint.

145.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the products.

146.    Defendant has profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

147.    Plaintiffs and the Class Members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the products at issue.

148.    As a direct and proximate result of Defendant's actions, Plaintiffs and class members have suffered in an amount to be proven at trial.

149.    Putative class members have suffered an injury in fact and have lost money as a result of Defendant's unjust conduct.

150.    Plaintiffs and members of the Class are entitled to equitable relief because no adequate remedy at law exists.

151.    Legal remedies are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.

152.    Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.

153.    Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Plaintiffs seek non-restitutionary disgorgement of profits in connection with his unjust enrichment claim.

154.    Legal claims for damages are not equally certain as restitution because equitable claims entail few elements.

155.    In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

156.    Putative class members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)   An award of statutory damages to the extent available;

(e)   For punitive damages, as warranted, in an amount to be determined at trial;

(f)   For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 10, 2025                         Respectfully submitted,

**GOLDBERGER & DUBIN, PC**

By:    */s/ Stacey Van Malden*
Stacey Van Malden, Esq. (Bar No.: SV8077)
Of Counsel
401 Broadway, suite 306
New York, New York 10013
Phone: 212-431-9380
Email: GND401@AOL.COM

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (Cal. Bar No. 295032)*
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (Cal. Bar No. 244902)*
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404

E-Mail:  joel@skclassactions.com

*To be admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

**CLRA Venue Declaration, Civil Code § 1780(c)**

I, Stacey Van Malden, declare as follows:

1.     I have personal knowledge to the facts stated herein and, if called upon to do so, could competently testify hereto.

2.     I am the attorney for Plaintiffs in the above-captioned action.

3.     I submit this declaration in support of the Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code § 1750 *et seq.*

4.     The Class Action Complaint has been filed in the proper place for trial of this action.

5.     It is my understanding that Defendant regularly transacts business in this County, and the acts and omissions giving rise to this action occurred in large part in this County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on January 10, 2025 in Brooklyn, New York.

By:  _ /s/ Stacey Van Malden_
Stacey Van Malden